UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____x

MALIKAH ALKEBULAN, Administrator of the
ESTATE OF ANTWOINE FORT,                                  20 Civ. 6166 (EAW) (MWP)

               Plaintiff,                               **SECOND AMENDED
COMPLAINT AND
JURY DEMAND**

         -against-

DR. FRANK GALANTE, Psychiatrist, Attica
Correctional Facility; DR. KALYANA BATTU,
Psychiatrist, Attica Correctional Facility; ERIN
KNIGHT, Social Worker, Attica Correctional
Facility; JACQUELYN GORSKI, Social Worker, Attica
Correctional Facility; LYNDA BATTAGLIA,
OMH Unit Chief, Attica Correctional Facility;
DR. ARUNA PAL, Psychiatrist, Great Meadow
Correctional Facility; ANGELA WOODBURY,
Social Worker, Great Meadow Correctional Facility;
COREY JACKSON, OMH Unit Chief, Great Meadow
Correctional Facility; LT. ANDREW ENSER,
Attica Correctional Facility; FMR. SGT. GARRETT
WYNN, Attica Correctional Facility; C,O, WILFREDO
VARGAS, Attica Correctional Facility; C.O. NEIL
BUTH, Attica Correctional Facility; C.O. JASON
STEFANIAK, Attica Correctional Facility; C.O.
ROBERT PARKHURST, Attica Correctional Facility;
C.O. RYAN FINN, Attica Correctional Facility; and
JOHN AND JANE DOES 1-10,

              Defendants.

_____x


     Plaintiff Estate of Antwoine Fort, by and through its Administrator, Malikah Alkebulan,

and its attorneys, Cuti Hecker Wang LLP, for its Second Amended Complaint alleges against

Defendants as follows:

## **NATURE OF THE ACTION**

1.      Plaintiff's decedent, Antwoine Fort ("Antwoine"), was in the custody of the New York State Department of Corrections and Community Supervisions ("DOCCS") and under the psychiatric care of the New York State Office of Mental Health ("OMH") and its officials when he became severely and actively suicidal in August 2018.

2.      Antwoine tried to commit suicide on August 29, 2018 by overdosing on pills.  He tried to commit suicide again by overdosing on pills on November 20, 2018, although he reported to OMH officials that he had initially intended to hang himself.  He made hanging gestures on October 2, October 26, and November 8, 2018; he talked expressly about hanging in conversations with OMH representatives on November 14 and November 18, 2018; and throughout October and November 2018, he told OMH officials dozens of times that he was determined to kill himself, that he would do so at his earliest opportunity, and that it was pointless to try to stop him.

3.      Astonishingly, on November 27, 2018, just eight days after Antwoine was rushed to the hospital unresponsive after overdosing on pills, and just one day after Antwoine had tried to cut his wrist with a sharpened toothbrush, OMH determined that Antwoine no longer needed a safety smock and could be given regular prison clothes.  OMH made that determination notwithstanding Antwoine's months-long campaign of active, repeated, and consistent threats to kill himself as soon as he was able.

4.      Less than two days later, Antwoine hung himself with his prison clothes and died.

5.      This action is about the deliberate indifference of the OMH and DOCCS officials who allowed this clearly foreseeable and avoidable tragedy to happen before their eyes.

2

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1367(a).

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

8.      Plaintiff the Estate of Antwoine Fort is the entity authorized by law to pursue claims related to Mr. Fort's wrongful death.  The Estate of Antwoine Fort is authorized to commence this suit by its court-appointed administrator, Malikah Alkebulan, in whose name in that capacity it is commenced.

9.      Defendant Dr. Frank Galante was, at the relevant time, a psychiatrist at Attica Correctional Facility employed by and/or acting under the supervision and/or at the direction of OMH.

10.      Defendant Dr. Kalyana Battu was, at the relevant time, a psychiatrist at Attica Correctional Facility employed by and/or acting under the supervision and/or at the direction of OMH.

11.      Defendant Erin Knight was, at the relevant time, a social worker at Attica Correctional Facility employed by and/or acting under the supervision and/or at the direction of OMH.

12.      Defendant Jacquelyn Gorski was, at the relevant time, a social worker at Attica Correctional Facility employed by and/or acting under the supervision and/or at the direction of OMH.

13.     Defendant Lynda Battaglia was, at the relevant time, the OMH Unit Chief at Attica Correctional Facility.

14.     Defendant Dr. Aruna Pal was, at the relevant time, a psychiatrist at Great Meadow Correctional Facility employed by and/or acting under the supervision and/or at the direction of OMH.

15.     Defendant Angela Woodbury was, at the relevant time, a social worker at Great Meadow Correctional Facility employed by and/or acting under the supervision and/or at the direction of OMH.

16.     Defendant Corey Jackson was, at the relevant time, the OMH Unit Chief at Great Meadow Correctional Facility.

17.     Defendants Galante, Battu, Knight, Gorski, Battaglia, Pal, Woodbury, and Jackson shall be referred to herein collectively as the "OMH Defendants."

18.     Defendant Andrew Enser was, at the relevant time, a lieutenant at Attica Correctional Facility employed by and/or acting under the supervision and/or at the direction of DOCCS.

19.     Defendant Garrett Wynn was, at the relevant time, a sergeant at Attica Correctional Facility employed by and/or acting under the supervision and/or at the direction of DOCCS.

20.     Defendant Neil Buth was, at the relevant time, a correction officer at Attica Correctional employed by and/or acting under the supervision and/or at the direction of DOCCS.

21.     Defendant Wilfredo Vargas was, at the relevant time, a correction officer at Attica Correctional employed by and/or acting under the supervision and/or at the direction of DOCCS.

22.     Defendant Robert Parkhurst was, at the relevant time, a correction officer at Attica Correctional employed by and/or acting under the supervision and/or at the direction of DOCCS.

23.     Defendant Jason Stefaniak was, at the relevant time, a correction officer at Attica Correctional employed by and/or acting under the supervision and/or at the direction of DOCCS.

24.     Defendant Ryan Finn was, at the relevant time, a correction officer at Attica Correctional employed by and/or acting under the supervision and/or at the direction of DOCCS.

25.     Defendants Enser, Wynn, Buth, Vargas, Parkhurst, Stefaniak, and Finn shall be referred to herein collectively as the "DOCCS Defendants."

26.     At the relevant time, John and Jane Does 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe" or "Jane Doe," were employees or agents of the State of New York serving as psychiatrists, psychologists, nurses, therapists, or other mental health or supervisory personnel performing services for DOCCS and/or OMH and, as such, were acting under color of state law.

## JURY TRIAL DEMANDED

27.     Plaintiff demands a trial by jury.

## FACTUAL ALLEGATIONS

Background

28.     Plaintiff's decedent, Antwoine Fort ("Antwoine"), was born in June 1987.

29.     Antwoine grew up in Brooklyn, New York.

30.     Antwoine was a talented athlete who excelled at football.

31.     Antwoine also was a talented musician and burgeoning rapper who was involved in the hip hop scene.

Antwoine Attempts Suicide in 2008

32.      Antwoine was arrested in November 2006 and convicted of criminal sale of a controlled substance in the 5th degree in 2007, when he was 20 years old.

33.     He was sentenced to three years, and a conditional release date was set for October 2009.

34.     Antwoine was found to have committed a disciplinary infraction and was placed in the Auburn Correctional Facility Special Housing Unit ("SHU") on or about October 7, 2008.

35.     SHU prisoners are housed in single cells and permitted only 1-2 hours per day of recreation.  Typically, they are confined to complete solitude in their cells for at least 22 hours per day.

36.     On or about December 8, 2008, Antwoine was admitted into the Residential Crisis Treatment Program ("RCTP") at Auburn Correctional Facility because he attempted to commit suicide in the SHU by overdosing on antidepressant pills.

37.     OMH officials diagnosed Antwoine with adjustment disorder with depressed mood.

38.     OMH officials placed Antwoine on one-on-one suicide watch.

39.     For weeks thereafter, Antwoine continued to be actively and severely suicidal.

40.     He repeatedly told OMH officials that he was determined to kill himself and that he would succeed in killing himself.

41.     While in the RCTP, Antwoine shredded his mattress and attempted to fashion a noose with which to hang himself.

6

42.     Antwoine repeatedly told OMH officials that he was despondent about his older brother's murder (his older brother had been shot to death years earlier), that he wished to join his brother in death, and that he often heard his brother's voice urging Antwoine to harm himself or others.

43.     Antwoine went on a hunger strike, which he made clear was designed to cause his death so that he could join his brother.

44.     On December 13, 2008, Antwoine requested a call-out with a OMH nurse.  He broke down and cried about how he felt responsible for his brother's death and needed and wanted help.  The nurse spoke with him sympathetically, and Antwoine agreed to end his hunger strike.

45.     Two days later, on December 15, 2008, Antwoine was informed that he was being returned to the SHU.  He had been showing signs of emotional and psychological improvement, but he instantly regressed upon learning of his transfer back to the SHU.  He started yelling that nobody understood that he could not control his own behavior, that he had had a terrible childhood, that the SHU isolation was intolerable, and that he needed help.  He yelled for his dead brother and pounded on the walls.

46.     Antwoine was seen by a OMH psychiatrist on December 16, 2008.  He told the psychiatrist that he talked to his dead brother and that his brother told him to "join" him or to hurt himself or others.  Antwoine also emphasized that he could not bear to be returned to the SHU.

47.     Antwoine was prescribed Trazadone, and his mental health status was increased to Level 3.

7

48.     Antwoine presented similarly on December 17 and December 18, 2008.  When the subject of the SHU came up, his behavior devolved immediately, and he began screaming and crying about his brother and about how he needed help.  He said repeatedly to OMH officials that he needed therapy, not the SHU:  "I try to fight my head, but it always goes back to do what he says:  hurt others or yourself."  He stated unequivocally, multiple times, that if he was returned to the SHU, he would kill himself and join his brother.

49.     On December 22, 2008, Antwoine was returned to the SHU.

50.     On February 13, 2009, Antwoine was transferred from Auburn Correctional Facility to Elmira Correctional Facility.  He was received by the Elmira RCTP.

51.     Antwoine reported to Elmira OMH officials that he was not doing well and feeling paranoid.  He "expressed thoughts of self-harm" and was quoted as saying "I just want help."

52.     In the following days, Antwoine reported repeatedly to Elmira OMH officials that he heard his deceased brother's voice.

53.     Antwoine remained in the Elmira RCTP until February 23, 2009.  He indicated that he might hurt someone if released to the general population, but nevertheless he was prescribed Wellbutrin and Trazadone and deemed safe.

2009-2013

54.     Antwoine was released from prison in October 2009.

55.     He was released to federal officials and incarcerated in prison for an additional, extended period of time relating to his 2006 arrest.

56.     Upon information and belief, Antwoine was released from federal prison in 2012 or 2013.

2014-August 2018

57.     Antwoine was arrested on January 16, 2014 and eventually convicted of attempted robbery in the first degree.  He was sentenced to 11 years, with a conditional release date of September 15, 2021.

58.     Antwoine began his second DOCCS incarceration at Great Meadow Correctional Facility.

59.     He was transferred to Attica Correctional Facility in March 2015.

60.     Shortly after arriving at Attica Correctional Facility, Antwoine reached out to OMH and requested a mental health session, during which he reported that he had had thoughts of hurting people.

61.     Antwoine was placed in the Attica SHU in August 2015.

62.     In November 2015, Antwoine was transferred to Upstate Correctional Facility, where he was placed in the SHU.

63.     Antwoine was transferred to Five Points Correctional Facility in September 2016 and was placed in the Five Points SHU in January 2018.

64.     Antwoine was transferred to Upstate Correctional Facility in March 2018 and placed in the SHU there.

65.     Antwoine was transferred to Great Meadow Correctional Facility in April 2018 and placed in the SHU there.

66.     It is not clear why Antwoine was transferred five times in three years or why he apparently was in the SHU most or all of the time beginning in August 2015.

67.     In any event, by April 2018, Antwoine was in the Great Meadow SHU, and he had been in the SHU for most or all of the prior three years.

68.     During this three-year period (mid-2015 to mid-2018), it appears that Antwoine was screened by DOCCS and/or OMH mental health officials numerous times, but that nobody was diligent enough to determine that Antwoine had engaged in serious prior suicide attempts in 2008 after being placed in the SHU, nor does it appear that Antwoine received any significant mental health services between mid-2015 and August 29, 2018.

August 29, 2018 to November 29, 2018

69.     On or about August 29, 2018, Antwoine tried to commit suicide by overdosing on medication.

70.     He left a suicide note.

71.     Antwoine was sent to an outside hospital, revived, and returned to Great Meadow Correctional Facility shortly thereafter, where he was placed in the RCTP.

72.     From that time until his death two months later on November 29, 2018, Antwoine was continuously on one form of suicide watch or another – often on one-on-one watch, and at a minimum observed at 15 minute intervals.

73.     Defendant Aruna Pal, a psychiatrist, saw Antwoine right after he returned from the hospital to the Great Meadow RTCP.  She diagnosed him with adjustment disorder with mixed anxiety and depressed mood.

74.      Throughout his stay at the Great Meadow RCTP from August 29, 2018 to November 2018, Antwoine's primary mental health clinician was Defendant Angela Woodbury, a psychologist.

67.     Defendant Woodbury saw Antwoine most mornings on rounds.

68.     Antwoine often refused to talk to Defendant Woodbury, and he sometimes said rude things to her.

10

69.     Defendant Woodbury failed to take appropriate steps to treat Antwoine, even as his mental and emotional condition deteriorated significantly and obviously.

70.     When Antwoine returned from the hospital to the Great Meadow RCTP on August 29, 2018, he began a hunger strike, just as he had done when he was acutely suicidal in 2008.

71.     By August 31, 2018, Antwoine had not eaten in three days.  The nurses' notes indicate that Antwoine seemed flat, depressed, and not very responsive, occasionally tearful, and often naked.

72.     By September 4, 2018, Antwoine's behavior had become more aggressive.  He was frequently agitated, often yelling and banging and kicking.

73.     On September 5, 2018, Defendant Pal saw Antwoine for the second time. Antwoine cried throughout the interview.  He stated unequivocally that he was going to kill himself, saying "catch me, be there."  Dr. Pal noted that Antwoine still was not eating.  She did not prescribe any psychiatric medication, nor did she identify a clear treatment plan.

74.     Defendant Woodbury saw Antwoine again on September 6, 2018.  He still was not eating and refused to engage with her.

75.     Antwoine was hospitalized from September 7 to September 10, 2018 because of his ongoing hunger strike.

76.     When Antwoine returned to the Great Meadow RTCP on September 10, 2018, he resumed eating but continued to present as depressed, sad, and flat.

77.     On September 12, 2018, Antwoine reported to OMH officials that he was not doing well and requested that he be transferred to OMH's central psychiatric hospital in Marcy, New York.

11

78.     Defendant Woodbury saw Antwoine again on September 13, 2018 and then not again until September 18, 2018.  During the intervening several days, Antwoine deteriorated significantly and obviously, refusing to eat, acting depressed and withdrawn, and speaking openly about his suicidal ideations.

79.     Defendant Woodbury's notes from her interactions with Antwoine on September 18, 19, and 20 document his obvious decline.  He complained repeatedly about his fear of correction officers, he had not eaten for eight days, and OMH officials were considering putting him on a feeding tube.

80.     Antwoine started eating again a few days later, but his mental condition did not improve.  He continued to present as depressed, he often complained about his fear of correction officers, and he spoke openly about his desire to harm himself.

81.     On September 29, 2018, Defendant Corey Jackson, the Great Meadow OMH Unit Chief, spoke with Antwoine.  Antwoine complained to Defendant Jackson about his specific fear of DOCCS officers, who Antwoine believed were "out to get him."  Antwoine told Defendant Jackson expressly that "I will hurt myself first" before allowing correction officers to hurt him.

82.     On October 2, 2018, Antwoine made hanging gestures and was placed once again on one-on-one suicide watch.

83.     On October 3, 2018, Antwoine reported to OMH officials that he was not doing well, that he did not feel safe, and that "I'm going to kill myself before they kill me."  He complained about condition (such as not being able to shower) and said that he did not want to live the way he had been living.  A nursing note indicates that he was screaming and banging in his cell.

84.    A nurse practitioner also saw Antwoine on October 3, 2018.  He told her "I want to die," explaining that he would prefer to harm himself before officers did.  He said that he did not think he could feel safe anywhere in prison and that there was no solution to that problem.

85.    Defendant Woodbury saw Antwoine again on October 5, 9, 10, 11, and 12.  Over the course of that week, Antwoine continued to be actively and obviously suicidal.

86.    On October 15, 2018, Antwoine told Defendant Woodbury that he "wanted outta here," and when she asked him what he meant, he stated that he meant "out of this world."  He described years of harassment by correction officers at different facilities and told her "I'm making my own choices, I won't die by their hands."  He begged to be released so that he could kill himself, saying "they weren't supposed to save me."

87.    Upon information and belief, Defendant Woodbury did not see Antwoine until October 29, 2018, two weeks later.

88.    During those two weeks, Antwoine was often dysregulated, screaming, banging, pacing, crying, and repeatedly talking about self-harm.

89.    On October 26, 2018, Antwoine was observed trying to tear up "state equipment" to fashion a noose.

90.    When Defendant Woodbury saw Antwoine on October 29, 2018, she described him as "grotesque" in her notes.

91.    Defendant Woodbury saw Antwoine again on October 30, October 31, and November 1, 2018, but he refused to talk to her on each occasion.

92.    Defendant Pal saw Antwoine on November 2, 2018.  This was his first meeting with a psychiatrist since September 5, 2018, nearly two months earlier.  Antwoine told

Defendant Pal that he was suicidal.  She noted that he was actively having suicidal ideations, had high suicide risk factors, and would not take medication.

93.     Antwoine's case was then discussed with the full treatment team, including Defendant Jackson.

94.     On November 8, 2018, Antwoine once again signaled his intention to try to hang himself by "attempting to hang up while standing on his toes."  He was placed back on one-on-one suicide watch.

95.     From November 8 to November 13, 2018, Antwoine's mental condition continue to be very poor.

96.     On November 13, 2018, Antwoine was transferred from Great Meadow Correctional Facility to Attica Correctional Facility.  Antwoine was transferred even though the recent transfer to another facility is a known suicide risk factor and even though Antwoine was known to be actively suicidal at the time of his transfer.

97.     Defendant Woodbury completed and transmitted the Termination Transfer Progress Note ("TTPN") to Attica Correctional Facility.

98.     The TTPN is a very important document.  Its purpose is for the transferor OMH facility to alert the transferee OMH facility about material information that the transferee facility should know about the inmate in order to keep him safe.  Because there ordinarily is no verbal communication between the transferor OMH facility and the transferee OMH facility about the inmate being transferred, the TTPN typically serves as the only opportunity for the OMH officials with knowledge about the inmate to convey relevant information to the OMH officials who will be taking over the care of the inmate.

14

99.     The TTPN that Defendant Woodbury transmitted to Attica Correctional Facility was inadequate.  Defendant Woodbury noted generally that Antwoine had attempted suicide in August 2018 and then engaged in a hunger strike.  But she said nothing in the TTPN about the fact that Antwoine remained actively suicidal at the time of his transfer.  Defendant Woodbury did not note that Antwoine had consistently threatened to commit suicide throughout his time at the Great Meadow RTCP, or that he had engaged in suicidal gestures, including hanging gestures, as recently as five days earlier and therefore recently had been on one-on-one suicide watch.

100.     On November 14, 2018, the day after Antwoine arrived at Attica Correctional Facility, Defendant Erin Knight, a social worker, assessed him.  Antwoine was emotional and crying and said he was not doing well.  He stated multiple times that he wanted to die and did not understand why staff would not just let him do it.  He talked about his August 2018 suicide attempt, his hunger strike, and his recent attempt to "hang up."  He explained to Defendant Knight that he needed to kill himself because he could no longer tolerate his treatment by DOCCS.  He said that he wanted to "end his life by any means possible and feels that staff should let him."  He went on and on about how there was no safe place at DOCCS and that he would kill himself at the earliest opportunity.

101.     A November 15, 2018 suicide risk assessment form noted that Antwoine continued to be a high suicide risk, especially given his recent "hanging gestures."  This suicide risk assessment form noted that the full treatment team, including Defendant Lynda Battaglia, the OMH Unit Chief, had discussed Antwoine's case and that he would remain on suicide watch.

15

102.    On November 19, 2018, Antwoine was seen by Defendant Kalyana Battu, a psychiatrist.  Defendant Battu noted Antwoine's history, including his hanging attempts.  She prescribed Zoloft and Trazadone.

103.    Later on November 19, 2018, Antwoine was transferred from the Attica RCTP to the Attica SHU, even though he was deemed a high suicide risk only days earlier.

104.    Not surprisingly, on November 20, 2018, less than a day after being transferred to the SHU, Antwoine once again attempted to commit suicide.  He left a suicide note and attempted to overdose on medication.

105.    Antwoine was found to have a high concentration of barbiturates in his system. DOCCS expressly concluded that Antwoine's suicide attempt was "legitimate" and that he needed to be placed on "one-on-one suicide watch" when he returned from Wyoming County Community Hospital.

106.    Neither DOCCS nor OMH notified anyone in Antwoine's family that he had tried to commit suicide, either on August 29, 2018 or November 20, 2018.

107.    When he returned to Attica Correctional Facility, Antwoine explained to a social worker that he had planned to hang himself in the SHU, but that he had found medication and decided to try to overdose instead.  Antwoine made clear to the social worker that he would continue to try to end his life, saying "I am sick of this" and "I want total freedom" and that his conditional release date was "too far away."

108.    The next day, November 21, 2018, Antwoine told Defendant Knight that he would "eventually find a way to harm himself."

109.    On November 26, 2018, Defendant Knight completed a suicide risk assessment form stating clearly that Antwoine was actively suicidal.  Specifically, Defendant Knight wrote

16

that Antwoine "IS SUICIDAL AND THAT HE WILL BE SUICIDAL IF HE HAS TO CONTINUE TO DEAL WITH DOCCS."  Defendant Knight continued that Antwoine "SEES NO WAY OUT ASIDE FROM ENDING HIS LIFE AND THAT HE WILL ATTEMPT TO END HIS LIFE AGAIN WHEN GIVEN THE OPPORTUNITY."

110.    Also on November 26, 2018, Antwoine was assigned a mental health status level of 1S – the "S" meaning "serious" – which is the most serious mental health status level OMH can assign.  The person who made this decision noted that Antwoine was "upset because he was not successful" in attempting to commit suicide on November 20, 2018, six days earlier.

111.    On November 27, 2018, Antwoine was seen by Defendant Frank Galante, a psychiatrist, who took a detailed history.  Defendant Galante noted that the previous evening, Antwoine had attempted to cut his wrist with a sharpened toothbrush.  The social worker who sat in on this evaluation noted that Antwoine indicated that he was "tired of all of this," that he "wanted to expire," and that he would rather die than stay in prison until 2021.

112.    Astonishingly, Defendant Galante nevertheless approved Antwoine to receive a regular set of prison clothing rather than the safety smock that he had been compelled to wear while on suicide watch.

113.    Defendant Galante wrote that he made this decision because Antwoine supposedly "has not referenced a desire or thought to hang himself," even though Antwoine had made hanging gestures on October 2, October 26, and November 8, 2018; even though he had talked about hanging expressly on November 14, and November 18, 2018; and even though he reported that his intent was to hang himself in the SHU on November 20, 2018, before he unexpectedly found pills.

17

114.    On or about November 27, 2018, it was determined that Antwoine's mental health condition was so severe that he should be transferred at the earliest opportunity to the Central New York Psychiatric Center in Marcy, New York.

115.    On November 29, 2018, less than two days later, Antwoine hanged himself with his prison clothing and died.

116.    DOCCS records reflect that he was no longer on one-on-one suicide watch. DOCCS was checking on him no more frequently than every 15 minutes.

117.    Antwoine told DOCCS employees on the night of November 28, 2018 that he planned to cause problems during the overnight shift.  Specifically, Antwoine communicated to multiple officers that he intended to self-harm.

118.    On the night of November 28 to November 29, 2018, DOCCS officers observed that Antwoine had affixed State-issued clothing from the ceiling vent in his cell.  The size and shape of the clothing hanging from the ceiling changed over the course of the evening.

119.    Notwithstanding the officers' understanding that Antwoine intended to harm himself that night, DOCCS employees did not direct Antwoine to remove the clothing hanging from his ceiling nor did any DOCCS employee remove the clothing hanging from Antwoine's ceiling,

120.    In the minutes and hours before Antwoine hanged himself with his State-issued clothing, multiple DOCCS officers observed that Antwoine had obstructed the camera in his cell. DOCCS employees did not direct Antwoine to take down the covering nor did any DOCCS employee arrange for monitoring of his cell during the period of time in between rounds.

## <u>FIRST CAUSE OF ACTION</u>
### (Violation of the Eighth and Fourteenth Amendments – 42 U.S.C. § 1983)

121.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

122.    Each of the Defendants was deliberately indifferent to Antwoine's serious medical condition and/or to concrete signs and communications from Antwoine that he intended to commit self-harm.

123.    The OMH Defendants were aware that Antwoine had numerous suicide risk factors that created a significant risk that he would commit suicide and that he was in fact actively suicidal.

124.    The DOCCS Defendants were aware that Antwoine was actively suicidal and that he had the means to harm himself if he was not appropriately supervised by them.

125.     Defendants nevertheless failed to take adequate steps to mitigate the risk that Antwoine would commit suicide.

126.    Defendants were aware that their inaction made it foreseeable that Antwoine would commit suicide, and they consciously disregarded that risk.

127.    Defendants were aware that their actions and omissions created a substantial risk of serious harm.

128.    Defendants acted recklessly.

129.    Defendants' deliberate indifference to Antwoine's serious medical condition and obvious risk of self-harm proximately caused Antwoine to suffer extreme pain and suffering and death.

130.    Defendants acted under color of state law.

131.    All of the foregoing constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

132.    As a result of the foregoing, the Estate of Antwoine Fort is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Negligence)**

133.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

134.    Defendants owed Antwoine a duty of care with respect to his health and safety.

135.    When prison authorities know or should know that a prisoner has suicidal tendencies or that a prisoner might physically harm himself, a duty arises to provide reasonable care to assure that such harm does not occur.

136.    Defendants were or should have been aware that there was a serious risk that Antwoine would commit suicide.

137.    It was or should have been foreseeable to Defendants that Antwoine would commit suicide.

138.    Defendants failed to take reasonable steps to prevent Antwoine's suicide.

139.    Defendants acted negligently.

140.    As a direct and proximate result of the foregoing, the Estate of Antwoine Fort is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Wrongful Death)**

141.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

142.    By reason of all of the foregoing, the statutory distributees of the Estate of Antwoine Fort sustained pecuniary and non-pecuniary loss resulting from the loss of Antwoine's love, comfort, society, attention, services, and support.

143.    Defendants are liable for Antwoine's wrongful death.

144.    As a direct and proximate result of the foregoing, the statutory distributees of the Estate of Antwoine Fort are entitled to recover compensatory and punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Survivorship – Conscious Pain and Suffering)**

145.    Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

146.    Antwoine experienced severe conscious pain and suffering as a direct and proximate cause of Defendants' deliberate indifference, recklessness, and negligence.

147.    Antwoine experienced cognitive awareness and pre-death terror.

148.    As a direct and proximate result of the foregoing, the Estate of Antwoine Fort is entitled to recover compensatory and punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a.   Awarding compensatory damages in an amount to be determined at trial;

b.   Awarding punitive damages in an amount to be determined at trial;

c.   Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d.   Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
          February 11, 2021

                                    By: _____
                                         Eric Hecker
                                         Alice G. Reiter

                                    CUTI HECKER WANG LLP
                                    305 Broadway, Suite 607
                                    New York, New York 10007
                                    (212) 620-2600

                                    *Attorneys for Plaintiff*